## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Steven McCarthy,<br><br>                       Plaintiff,<br><br>           -v-<br><br>JP Morgan Chase Bank,<br><br>                     Defendant. | 2:23-cv-5818<br>(NJC) (JMW) |

## MEMORANDUM AND ORDER

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiff Steven McCarthy ("McCarthy") brought this case against Defendant JPMorgan Chase Bank, N.A. ("Chase")[1] on July 31, 2023, seeking relief following an incident in which McCarthy, through a series of wire transfers, transferred $247,000 from his Chase bank accounts to scammers in Thailand. (Compl., ECF No. 1.) While the Complaint does not expressly identify a cause of action, it appears to assert a New York common law negligence claim.[2] (*See generally* Compl.) The Complaint alleges that Chase "knew or should have known" that McCarthy was likely being scammed (despite having no involvement in the scam) and, accordingly, that Chase had a duty to warn McCarthy of the likely scam before carrying out the wire transfers. (*Id.*

---

[1] McCarthy's Complaint refers to Chase as "JP Morgan Chase Bank," but Chase notes in its opening brief that its correct name is "JPMorgan Chase Bank, N.A." (Mem. Supp. Mot. Dismiss ("Mot.") at 1, ECF No. 25.)

[2] As a threshold matter, the Complaint does not expressly state what cause of action McCarthy intends to assert. (*See generally* Compl.) Its allegations referencing a "duty to warn" and a "duty of reasonable care" and citing tort cases concerning a "duty to warn" most clearly allege a negligence claim under New York tort law. (*Id.* ¶¶ 4–11).)

¶¶ 10–12.) McCarthy seeks $247,000 in compensatory damages, plus interest, costs, and attorney's fees. (*Id.* at 2.)

Before the Court is Chase's Motion to Dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") ("Motion"). (ECF No. 23.) For the reasons set forth below, Chase's Motion is granted and the Complaint is dismissed with prejudice.

## BACKGROUND

The following facts are taken from the Complaint (Compl.), as well as the documents attached to the declaration filed by Chase's counsel Sylvia Ester Simson ("Simson Declaration") (Simson Decl., ECF No. 24),[3] which include:

(1) the personal signature cards for McCarthy's Chase Premier checking account (Checking Account Signature Card, Simson Decl. Ex. 1, ECF. No. 24-1) and his Chase Plus savings account (Savings Account Signature Card, Simson Decl. Ex. 2, ECF. No. 24-2);

(2) Chase's deposit account agreements with McCarthy (Nov. 8, 2020 Deposit Account Agreement, Simson Decl. Ex. 3, ECF No. 24-3; Feb. 7, 2021 Deposit Account Agreement, Simson Decl. Ex. 4, ECF No. 24-4 (together, the "Deposit Account Agreements");[4]

(3) McCarthy's February 17, 2021 bank statement for his Chase checking and savings accounts (McCarthy Account Statement, Simson Decl. Ex. 5, ECF No. 24-5); and

---

[3] Under the Second Circuit's decision in *Clark v. Hanley*, I consider documents that are incorporated by reference in the Complaint, integral to the Complaint, or otherwise the subject of judicial notice. 89 F.4th 78, 93 (2d Cir. 2023). As discussed further below at Discussion Section I, I find that the documents attached to the Simson Declaration are integral to the Complaint. Nevertheless, I do not need to—and, accordingly, I do not—consider them in reaching my conclusion that McCarthy's negligence claim is preempted by New York Uniform Commercial Code Article 4-A and that Chase owes no extracontractual duty to McCarthy that would support a negligence claim here.

[4] The relevant time period in this action is January 2021 to March 2021. On February 7, 2021, Chase issued a new operative Deposit Account Agreement. The two versions of the Deposit Account Agreement are identical in all respects relevant to this Motion. (*See* Nov. 8, 2020 Deposit Account Agreement; February 7, 2021 Deposit Account Agreement.)

(4) Chase's consumer international wire transfer combined disclosure and receipt forms ("Wire Transfer Agreements") (Wire Transfer Agreements, Simson Decl. Ex. 6, ECF No. 24-6).[5]

McCarthy is a New York citizen who resides in Riverhead, New York. (Compl. ¶ 1.) Chase is a national banking institution with offices across the country, including on Long Island. (*Id.* ¶ 2.) McCarthy holds a Chase Premier checking account with an account number ending in 4735 ("checking account"), which he opened on October 28, 2005. (Checking Account Signature Card at 1.) He also holds a Chase Plus savings account with an account number ending in 8260 ("savings account"), which he opened on November 5, 2008. (Savings Account Signature Card at 1.)

The Deposit Account Agreements, to which McCarthy assented by signing the Checking Account Signature Card and Savings Account Signature Card, set forth the contractual relationship between Chase and McCarthy with respect to his Chase accounts. Relevant here, the Deposit Account Agreements provide, "[Chase] may subtract from your available balance the amount of any check or other item that [Chase] receive[s] throughout the day that you or any person you authorize created or approved." (Deposit Account Agreements ¶ III.E.2.) The Deposit Account Agreements also provide that "[Chase] will not be liable for anything [it] do[es] when following your instructions." (*Id.* ¶ IX.B.)

The Wire Transfer Agreements set forth the arrangement by which Chase wires funds for McCarthy. (*See* Wire Transfer Agreements.) Each Wire Transfer Agreement corresponds to an individual wire transfer; in other words, McCarthy must sign a new Wire Transfer Agreement

---

[5] McCarthy signed a form Wire Transfer Agreement each time he initiated a wire transfer. All relevant Wire Transfer Agreements are available at ECF No. 24-6, with the exception of the Wire Transfer Agreement corresponding to McCarthy's February 8, 2021 transfer, which Chase could not find. (*See* Mot. at 5 n.2.)

each time he initiates a wire transfer. (*Id.*) The Wire Transfer Agreements provide that "[Chase will] start processing [the accountholder's] wire transfer the same business day if [Chase] receive[s] it before the cutoff times [it] establish[es] . . . ."). (*Id.* ¶ 3(a).) They also inform the accountholder: (1) "You acknowledge that the security procedures used for wire requests you make in branch are a commercially reasonable method of verifying your branch wire transfer"; and (2) "You are responsible for any wire transfer issued in your name using these security procedures, whether or not you actually authorized the wire." (*Id.* ¶ 2(a).)

The Complaint alleges that between January 2021 and March 2021, scammers convinced McCarthy that hackers had infiltrated his Chase checking and savings accounts and were stealing funds from those accounts.[6] (Compl. ¶ 5.) At the time, McCarthy held approximately $250,000 between his two Chase accounts. (*Id.* ¶ 7.) McCarthy followed the scammers' directions to wire his funds to an account in Thailand, which the scammers referred to as "National Reserve." (*Id.* ¶¶ 5–6.) McCarthy made a series of these wire transfers, which he initiated in-person at Chase branches on Long Island—in Hampton Bays, Westhampton, Riverhead, and Mattituck. (*Id.*)

Specifically, McCarthy made the following wire transfers to an account in Thailand: (1) on February 1, 2021, he transferred $98,700 from his checking account; (2) on February 3, 2021, he transferred $98,900 from his savings account; (3) on February 8, 2021, he transferred $40,500 from his savings account; (4) on February 10, 2021, he transferred $49,500 from his checking account; and (5) on February 11, 2025, he transferred $46,600 from his checking account. (McCarthy Account Statement at 3–5.) According to McCarthy's February 17, 2021 account statement, Chase reversed the February 3, 2021 transfer of $98,900 on February 9, 2021 "as per

---

[6] The Complaint alleges that the scam occurred in early 2022, but it actually occurred in 2021, as made clear from McCarthy's February 17, 2021 account statement. (McCarthy Account Statement at 4–5.)

bene request." (*Id.* at 5.) In total, McCarthy wired $247,000 to the scammers in Thailand.[7] (Compl. ¶ 5.)

At the time he requested each wire transfer, McCarthy "advised the [Chase] bank officer that he had been instructed to wire money to Thailand." (Compl. ¶ 6.) The Complaint alleges that Chase "knew or should have known that there was a substantial probability that [McCarthy] was being scammed" but "did nothing to so warn" him. (*Id.* ¶¶ 10–11.) The Complaint further alleges that Chase had "a duty of reasonable care . . . to warn McCarthy" of the probability that he was being scammed. (*Id.* ¶¶ 10, 12.)

## PROCEDURAL HISTORY

McCarthy filed the Complaint in this action on July 31, 2023. (Compl.) On October 16, 2023, the case was reassigned to my docket. (Elec. Order, Oct. 16, 2023.) On November 13, 2023, I determined that McCarthy had established diversity jurisdiction. (Elec. Order, Nov. 13, 2023.)

On March 8, 2024, the parties filed Chase's fully briefed Motion on the docket. Chase filed a notice of motion, memorandum in support, and the Simson Declaration, attaching as exhibits the documents listed above. *See supra* Background Section; ECF Nos. 23–25. McCarthy filed a memorandum in opposition ("Opposition"),[8] and Chase filed a reply brief ("Reply"). (Mem. Opp'n Mot. Dismiss ("Opp'n"), ECF No. 26; Reply, ECF No. 27.)

---

[7] The Complaint alleges that McCarthy held approximately $250,000 collectively between his two accounts before initiating the wire transfers and that, in total, he transferred $247,000 to the scammers in Thailand. (Compl. ¶¶ 5, 7.) This amount does not exactly match the records submitted by Chase, which show $235,300 in transfers. The precise amount transferred, however, is immaterial to the Court's resolution of the instant Motion.

[8] McCarthy initially filed his Opposition on February 9, 2024 at ECF No. 22. Chase refiled McCarthy's Opposition on March 8, 2024 at ECF No. 26, as part of the bundled motion papers. The Opposition filings are identical.

On October 4, 2024, Chase filed a Notice of Supplemental Authority (Not. Suppl. Auth., ECF No. 28), attaching my August 16, 2024 decision in *Beck v. Metropolitan Bank Holding Corp.*, No. 23-cv-7564, 2024 WL 389461 (E.D.N.Y. Aug. 16, 2024). (Not. Suppl. Auth. Ex. 1, ECF No. 28-1.)

## JURISDICTION AND VENUE

In my Electronic Order dated November 13, 2023, I found that this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000. Elec. Order, Nov. 13, 2023; *see also* 28 U.S.C. § 1332(a) (granting federal district courts original jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States").

Chase did not raise personal jurisdiction or insufficient service of process defenses under Rule 12(b)(2) or (b)(5), Fed. R. Civ. P., and such defenses are therefore waived. *See* Fed. R. Civ. P. 12(b) ("A motion asserting [a Rule 12(b)(2) or (b)(5) defense] must be made before pleading if a responsive pleading is allowed."); Fed. R. Civ. P. 12(h)(1)(B) ("A party waives any defense listed in Rule 12(b)(2)–(5) by . . . failing to either: (i) make it by motion under this rule; or (ii) include it in a responsive pleading . . . .").

Venue is proper because a substantial part of the events McCarthy alleges occurred at Chase bank locations on Long Island, all of which are located within this judicial district. 28 U.S.C. § 1391(b)(2) (providing that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred").

## LEGAL STANDARD

A complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Cardinal Motors, Inc. v. H&H Sports Protection USA Inc.*, 128 F.4th 112, 120 (2d Cir.

2025) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[9] "In determining if a claim is sufficiently plausible to withstand dismissal" under Rule 12(b)(6), a court "accept[s] all factual allegations as true" and "draw[s] all reasonable inferences in favor of the plaintiffs." *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023). Nevertheless, a court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 307 (2d Cir. 2022). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *accord Schiebel v. Schoharie Central School District*, 120 F.4th 1082, 1106 (2d Cir. 2024). While "detailed factual allegations" are not required, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678. A complaint fails to state a claim "if it tenders naked assertions devoid of further factual enhancement." *Id.*

## DISCUSSION

Chase moves to dismiss the Complaint in its entirety under Rule 12(b)(6), raising three principal arguments. First, Chase—understanding the Complaint to assert a single negligence claim under New York tort law—argues that this claim is preempted by Article 4-A of the New York Uniform Commercial Code ("Article 4-A"). Second, Chase argues that even if McCarthy's negligence claim is not barred by Article 4-A, the Complaint does not state a viable negligence claim because, under New York tort law, banks do not have any extracontractual duties to their

---

[9] Unless otherwise noted, all internal quotation marks, brackets, and citations are omitted from case quotations.

accountholders. Third, Chase argues that it cannot be held liable for the alleged conduct because the relevant agreements between McCarthy and Chase—the Deposit Account Agreements governing the opening and maintenance of McCarthy's Chase accounts and the Wire Transfer Agreements governing his requests to transfer money from those accounts by wire—bar McCarthy's negligence claim.

In opposition, McCarthy does not dispute Chase's analysis of Article 4-A or "challenge the wiring process that occurred." (Opp'n at 1.) Instead, McCarthy asks the Court to impose "a duty to warn" on Chase based on the fact that some other states' tort laws impose a duty to warn in other contexts (though not in this specific context). (Opp'n at 4–15.) McCarthy concedes that he was "unable to locate an American case imposing a duty on a financial institution to warn customers of potential fraud" but asserts that courts in Canada and the United Kingdom have done so. (Opp'n at 11–16.) McCarthy argues that his claim falls outside the scope of Article 4-A's preemption because Chase breached its supposed "duty to warn" by failing to inform McCarthy that it suspected a scam *prior to* initiating the wire transfer process.

As explained further below, the Complaint fails to state a claim under New York common law. First, Article 4-A preempts McCarthy's common law claim. Second, even if McCarthy's common law claim were not preempted, the Complaint nevertheless fails to state a claim for negligence under New York tort law. Third, the relevant contracts between Chase and McCarthy (the Deposit Account Agreements and the Wire Transfer Agreements) do not impose a "duty to warn" on Chase.

## I. The Court's Ability to Consider Documents Outside the Pleadings

As a threshold matter, I must determine whether, and to what extent, I may consider the documents attached to the Simson Declaration. At the motion to dismiss stage, a court may consider documents that are incorporated by reference in the complaint, integral to the

complaint, or otherwise the subject of judicial notice. *Clark v. Hanley* 89 F.4th 78, 93 (2d Cir. 2023). In order for a document to be incorporated by reference in the complaint, "the complaint must make a clear, definite and substantial reference to the document[]." *Jajati v. JPMorgan Chase Bank, N.A.*, 711 F. Supp. 3d 169, 173 (E.D.N.Y. 2024); *see also Trump v. Vance*, 977 F.3d 198, 210 n.8 (2d Cir. 2020). In order for a document to be integral to the complaint, "the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the document[] in framing the complaint." *Jajati*, 711 F. Supp. 3d at 173; *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

As noted, the Simson Declaration attaches the following documents, all of which are extrinsic to the Complaint: (1) the signature cards corresponding to McCarthy's savings account (Savings Account Signature Card) and checking account (Checking Account Signature Card); (2) Chase's Deposit Account Agreements with McCarthy (Nov. 8, 2020 Deposit Account Agreement; Feb. 7, 2021 Deposit Account Agreement); (3) McCarthy's February 17, 2021 bank statement (McCarthy Account Statement); and (4) the Wire Transfer Agreements pertaining to the relevant transactions (Wire Transfer Agreements).

Under *Clark*, these documents are integral to the Complaint. The Deposit Account Agreements govern McCarthy's contractual relationship with Chase as an accountholder, and the account signature cards show McCarthy's assent to the Deposit Account Agreements. The Wire Transfer Agreement Forms reflect the agreements McCarthy entered with Chase when he initiated the wire transfers at issue in this case. McCarthy's February 17, 2021 bank statement is the available documentation showing that the transactions at issue were completed. "[T]here is no question that these documents are 'integral to the complaint' because the transactions at issue

here would not have occurred but for Plaintiff's execution of those documents." *Jajati*, 711 F. Supp. 3d at 173.

To be clear, while the Complaint does not explicitly reference these documents, it makes multiple references to McCarthy's Chase accounts (from which the alleged wire transfers were made) and the wire transfers carried out by virtue of McCarthy's contractual relationship with Chase. (Compl. ¶ 5 (referencing McCarthy's "JP Morgan Chase accounts"); *id.* ¶ 6 (referencing "wire transfers . . . made between January and March 202[1]); *id.* ¶ 7 (alleging that, at the time of the scam, McCarthy "maintained balances into JP Morgan Chase Bank accounts totaling approximately $250,000.00"); *id.* ¶ 8 ("[McCarthy] appeared in the aforesaid Chase branch on several occasions and initiated wire transfers . . ."); *id.* ¶ 9 (referencing McCarthy "sending funds by wire to a wire destination" in Thailand); *id.* ¶ 11 (alleging that McCarthy "wired $247,000.00 to scammers").) Moreover, in his opposition brief, McCarthy does not dispute the accuracy of any of these documents, nor does he "challenge the wiring process that occurred after [his] transfer request[s]." (Opp'n at 1.)[10] Accordingly, these documents are integral to McCarthy's common law claim and may be considered in connection with Chase's Motion. *See Jajati*, 711 F. Supp. 3d at 173 (finding wire transfer agreements integral to the complaint where the plaintiff "[did] not challenge the authenticity of those documents, nor [did] he challenge that they are the agreements that control the two wire transfers at issue in the [c]omplaint").

Although I may consider these documents as integral to the Complaint, I do not need to consider (and, accordingly, I do not consider) these documents in determining that Article 4-A

---

[10] Significantly, McCarthy does not even address whether the documents attached to the Simson Declaration are integral to the Complaint or may not be considered in resolving Chase's Motion. (*See* Opp'n at 17, (discussing the Deposit Account Agreements without addressing whether they may be considered on a motion to dismiss).)

preempts McCarthy's common law claim and that the Complaint fails to state a claim for negligence under New York common law. Accordingly, I only consider these documents in analyzing whether the contractual arrangements between McCarthy and Chase give rise to a "duty to warn" as alleged in the Complaint.

## II. Preemption Under New York Uniform Commercial Code Article 4-A

### A. Parties' Positions

Chase argues that McCarthy's common law claim is preempted by Article 4-A, which governs wire transfers. Chase asserts that Article 4-A applies to this case because the wire transfers at issue here were "fund transfers" as defined by Article 4-A-102 and Article 4-A-103(1)(a). (Mem. Supp. Mot. Dismiss ("Mot.") at 7–8, ECF No. 25.) Citing certain provisions in Article 4-A and case law from the Second Circuit, district courts, and New York's Appellate Division, Chase argues that Article 4-A prohibits any common law claims inconsistent with the requirements of Article 4-A. (Mot. at 8–9.)[11] Chase asserts that it complied with its obligation under Article 4-A-302(1)(a) "to issue, on the execution date, a payment order complying with the sender's order and to follow the sender's instructions . . . ," and that, in fact, it would have been liable under the New York Uniform Commercial Code had it *not* issued the wire transfers McCarthy ordered. (*Id.* at 10 (citing Article 4-A-302(1)(a)).) In further support, Chase cites a

---

[11] Specifically, Chase cites Article 4-A-102, which provides, in relevant part, that Article 4-A's rules are "intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article" and that "resort to principles of law or equity outside of Article 4-A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article." N.Y. U.C.C. § 4-A-102. Chase cites to the following cases: *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 801 (2d Cir. 2011); *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 104 (2d Cir. 1998); *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89 (2d Cir. 2010); *Pederson v. Midfirst Bank*, 527 F. Supp. 3d 188, 193 (N.D.N.Y. 2021); and *Golden Door V & I, Inc. v. TD Bank*, 123 A.D.3d 976, 979 (2d Dep't 2014).

series of federal and state court decisions dismissing similar claims. (*Id.* at 10 (citing *Wellton Int'l Express v. Bank of China (Hong Kong)*, 612 F. Supp. 3d 358, 364 (S.D.N.Y. 2020); *Blum v. Citibank, N.A.*, 162 A.D.3d 631, 632 (2d Dep't 2018)).) For these reasons, Chase argues, the "duty to warn" claim contemplated in the Complaint is inconsistent with the obligations of Article 4-A and thus is preempted. (*Id.* at 9.)

In opposition, McCarthy does not dispute Chase's characterization of Article 4-A and its preemption of common law claims concerning wire transfers. (Opp'n at 15–16.) Instead, McCarthy argues that Article 4-A does not apply here because his claim does not concern the wire transfers themselves, but rather Chase's alleged failure to warn McCarthy *before* it carried out the wire transfers. (Opp'n at 15–16.) McCarthy specifically relies on *Pedersen v. Midfirst Bank*, in which a district court held that "to the extent plaintiffs' claims are based on [the defendant bank's] actions before and after the processing of the wire transfer, such claims are not preempted." 527 F. Supp. 3d at 188; *see also*, *id.* ("The UCC does not displace all common law actions based on all activities surrounding funds transfers."); Opp'n at 15–16.

On reply, Chase argues that establishing the pre-transaction "duty to warn" for which McCarthy advocates would "usurp the [New York Uniform Commercial Code] preclusion rule" and notes that courts have found that Article 4-A preempts claims based on a bank's alleged negligence before a wire transfer occurred. (Reply at 2.) In particular, Chase asks me to follow the recent decision in *Jajati v. JPMorgan Chase Bank, N.A.*, in which another judge in this District found that Article 4-A preempted the plaintiff's negligence and gross negligence claims against Chase under similar factual circumstances. (Reply at 4 (citing *Jajati*, 711 F. Supp. 3d at 173).) There, the plaintiff did "not challeng[e] the propriety of how Chase handled the execution of the wire transfers themselves" but instead argued that "Chase was put on notice that the

[p]laintiff was the victim of a scam" and thus "should never have released the funds to the beneficiaries." *Jajati*, 711 F. Supp. 3d at 173. Chase also cites *Blum v. Citibank, N.A.*, in which the New York Appellate Division Second Department held that Article 4-A preempted a plaintiff's common law claim against Citibank "seeking essentially to recoup the moneys that he transferred from his account" at the direction of scammers. (Reply at 5 (citing *Blum*, A.D.3d 631).)

### B.  Statutory Background

Article 4-A "governs the procedures, rights, and liabilities arising out of commercial electronic funds transfers." *Niram, Inc. v. Sterling Nat'l Bank*, No. 21-cv-5966, 2023 WL 6394007 (S.D.N.Y. Sept. 29, 2023) (citing *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 797 (2d Cir. 2011), *appeal withdrawn*, No. 23-7661, 2024 WL 1985513 (2d Cir. Apr. 10, 2024).) "[A] funds transfer," as defined in Article 4-A, is "also commonly referred to in the commercial community as a wholesale wire transfer." N.Y. U.C.C. § 4-A-102, Official Cmt.

Article 4-A was promulgated in order to "address the problems presented by the widespread use of electronic funds transfers." *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89 (2d Cir. 2010).[12] Article 4-A created a "comprehensive body of law" that "use[s] precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability." N.Y. U.C.C § 4-A-102, Official Cmt.; *see also Ma*, 597 F.3d at 87–89 (citing *Banque Worms v. BankAmer. Int'l*, 570 N.E.2d 189, 194 (N.Y. 1991)). The statute "reflects a deliberate decision . . . to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment." *Ma*, 597 F.3d at 89 (citing N.Y. U.C.C. § 4-A-102, Official Cmt.). Thus, the drafters designed

---

[12] Article 4-A was adopted by the New York State Legislature in 1990. *Ma*, 597 F.3d at 89.

Article 4-A to be the "*exclusive means* of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article." *Fischer*, 632 F.3d at 801 (quoting N.Y. U.C.C. § 4–102, Official Cmt.) (emphasis added). Accordingly, Article 4-A precludes common law claims that arise out of wire transfers "when such claims would impose liability *inconsistent with* the rights and liabilities expressly created by Article 4-A." *Id.* at 797 (emphasis added). In other words, "resort to principles of law or equity outside of Article 4-A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article." N.Y. U.C.C. § 4-A-102, Official Cmt.

"Not all common law claims," however, "are per se inconsistent with" Article 4-A. *Ma*, 597 F.3d at 89. As the Second Circuit explained in *Ma*,

> Article 4-A controls how electronic funds transfers are conducted and specifies certain rights and duties related to the execution of such transactions. It calls for banks to adopt certain security procedures (§§ 4-A-201, 202), controls the timing for executing payments (§ 4-A-301), and assigns responsibility for reporting erroneous electronic debits (§§ 4-A-304, 505). Claims that, for example, are not about the mechanics of how a funds transfer was conducted may fall outside of this regime.

*Id.* The "critical inquiry" in determining whether Article 4-A has preempted a common law cause of action is "whether its provisions protect against the type of underlying injury or misconduct alleged in a claim." *Id.* at 89–90.

"Under [A]rticle 4-A, a funds transfer is initiated by a 'payment order,' which is an instruction from the person making the payment (the originator), to a 'receiving' or 'intermediary' bank to transfer the funds to the bank account of the beneficiary, normally in the 'beneficiary's bank.'" *U.S. Bank Nat'l Ass'n v. Zaccagnino*, 186 N.Y.S.3d 42, 45 (N.Y. App. Div. 2023) (quoting N.Y. U.C.C. §§ 4-A-103, -104). Article 4-A defines the "[r]eceiving bank" as "the bank to which the sender's instruction is addressed," and the "[b]eneficiary's bank" as

"the bank identified in a payment order in which an account of the beneficiary is to be credited pursuant to the order or which is to make payment to the beneficiary if the order does not provide for payment to an account." N.Y. U.C.C. § 4-A-103(1)(c)–(d). The "customer" is the person who has an account with a bank or from whom the bank has agreed to receive payment orders. *Id.* § 4-A-105(1)(c). The "[s]ender" is the person giving the instruction to the receiving bank. *Id.* § 4-A-103(1)(e). If a person issues a payment order to a bank to send a wire transfer from his own account with that bank, that person is both the customer and the sender for that transaction.

"Whether the bank or customer bears the risk of loss for a fraudulent wire transfer is determined by the interlocking provisions of Sections 4-A-202, 4-A-203, and 4-A-204" of Article 4-A ("Section 202," "Section 203," and "Section 204"). *Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A.*, 650 F. Supp. 3d 62, 75 (S.D.N.Y. 2023) (citing N.Y. U.C.C. §§ 4-A-202, -203, -204).[13]

Under Section 204, a bank is liable to refund its customer where it "accepts a payment order issued in the name of [that] customer as sender which is [] not authorized and not effective as the order of the customer under [Section 202]." N.Y. U.C.C. § 4-A-204. In order words, the bank must refund any wire transfer that is not "authorized" or otherwise "effective" as defined by Section 202. *Id.*

Section 202 defines the situations under which a wire transfer is "authorized" or otherwise "effective." *Id.* § 4-A-202. First, Section 202(1) provides that a wire transfer is the "authorized" in one of two situations: (1) where the customer authorizes the order, or (2) where

---

[13] *See also* N.Y. U.C.C. § 4-A-203, Official Cmt. (describing how the scheme allocates the risk of loss depending on whether a payment order is authorized or otherwise "verified"); *id.* § 4-A-202(2) (explaining that when a payment order is "verified" pursuant to certain security procedures, it is "effective").

the person authorizing the order is able to bind the customer under the law of agency. *Id.* § 4-A-202(1).[14] Even where a payment order is not considered an "authorized" order under Section 202(1), a payment may still be deemed "effective" under Section 202(2). *Id.* § 4-A-202(2). Section 202(2) provides that even where a payment order is *not* authorized, it is "effective" as the order of the customer where the bank and its customer agree on a security procedure to verify the wire transfer, the security procedure is commercially reasonable, and the bank accepted the payment order in good faith and in compliance with the security procedure. *Id.* § 4-A-202(2).[15]

---

[14] The term "authorized" is not otherwise defined in Article 4-A. Section 202(1) provides that "[a] payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound to it under the law of agency." N.Y. U.C.C. § 4-A-202(1). In the Official Comment to Sections 202 and 203, the drafters explained that under Section 202(1):

> the law of agency might allow the customer to be bound by an unauthorized order if conduct of the customer can be used to find an estoppel against the customer to deny that the order was unauthorized. If the customer is bound by the order under any of these agency doctrines, [Section 202(1)] treats the order as authorized and thus the customer is deemed to be the sender of the order.

*Id.* § 4-A-203, Official Cmt.

[15] Section 202(2) states, in full:

> If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (a) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (b) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer. The bank is not required to follow an instruction that violates a written agreement with the customer or notice of which is not received at a time and in a manner affording the bank a reasonable opportunity to act on it before the payment order is accepted.

*Id.* § 4-A-202(2).

Generally, if the wire transfer was either "authorized" under Section 202(1) or "effective" under Section 202(2), the bank does not have any obligation to refund the customer. *Cf. id.* § 4-A-204; *see also id.* § 4-A-203, Official Cmt.; *Essilor*, 650 F. Supp. 3d at 75. Section 203 provides a limited exception to this rule. *See* N.Y. U.C.C. § 4-A-203. Under Section 203, if a payment order is "effective" because it was properly verified as an order of the customer under Section 202(2), the receiving bank is still liable for the order where:

> the customer proves that the order was not caused, directly or indirectly, by a person (i) entrusted at any time with duties to act for the customer with respect to payment orders or the security procedure, or (ii) who obtained access to transmitting facilities of the customer or who obtained, from a source controlled by the customer and without authority of the receiving bank, information facilitating breach of the security procedure, regardless of how the information was obtained or whether the customer was at fault. Information includes any access device, computer software, or the like.

*Id.* The bank may have some refund obligation under Article 4-A where a customer attempts to cancel an authorized or effective order within a certain timeframe. S*ee* N.Y. U.C.C. § 4-A-211.

Generally, except as specifically provided in Sections 202 and 203, the "rights and obligations arising under [those Sections] may not be varied by agreement." *Id.* § 4-A-202(6). Under Section 212 of the New York Uniform Commercial Code, "except as provided in [Article 4-A] or by express agreement," a receiving bank "does not . . . have any duty to accept a payment order, or before acceptance, to take any action, or refrain from taking action, with respect to the order . . . . and the bank owes no duty to any party to the funds transfer . . . ." *Id.* § 4-A-212.

## C.  Analysis

Article 4-A clearly preempts McCarthy's common law claim. McCarthy does not dispute that the wire transfers at issue here are "funds transfers" governed by Article 4-A. *See* N.Y. U.C.C. §§ 4-A-103, 4-A-104(1); Opp'n at 15–16. The Complaint alleges that McCarthy visited

Chase branches on Long Island and ordered the wire transfers in-person, meaning that the wire transfers at issue were "authorized" under Section 202(1) and thus Chase cannot be held liable to pay back the funds unless one of Article 4-A's exception applies. *Cf. id.* § 4-A-204; *see also id.* § 4-A-203, Official Cmt.; *Essilor*, 650 F. Supp. 3d at 75. Section 203's exception for fund transfers that became effective as a result of a security breach does not apply because McCarthy does not allege any such breach here. *See id.* § 4-A-203. Likewise, Section 211's exception for fund transfers canceled within a certain time period is not applicable because the Complaint does not allege that McCarthy made any such cancellation attempt. *See id.* § 4-A-211. Nor does McCarthy claim that any other exemption applies here. (*See generally* Opp'n.) Because under Section 212 a bank "owes no duty to any party to the funds transfer" outside of those prescribed in Article 4-A, and because Chase's conduct as alleged in the Complaint complies with Article 4-A's requirements, McCarthy's common law claim is preempted by Article 4-A. N.Y. U.C.C. § 4-A-212.

The cases Chase cites are instructive. First, in *Jajati*, the plaintiff sued Chase for negligence and gross negligence after he wired money to scammers, discovered the scam about one month after the fact (i.e., well outside of the statutory window in Section 211), and unsuccessfully sought to have Chase reverse the wire transfers. 711 F. Supp. 3d at 172. The plaintiff argued that Article 4-A did not apply because he was not challenging "the propriety of how Chase handled the execution of the wire transfers themselves," but rather the fact that Chase "released the funds . . . after being put on notice of the alleged third-party fraud one month after the funds had been transferred." *Id.* at 177. The court correctly rejected this argument, holding that a ruling for the plaintiff would establish a "buyer's remorse" basis for refunding a wire transfer and would undermine Article 4-A's objective of "promoting certainty and predictability

18

in commercial transactions." *Id.* at 178.[16] Second, in *Blum*, the plaintiff sued Citibank under New York common law after transferring large sums of money from his Citibank account to a scammer. 162 A.D. 3d at 631. The New York Appellate Division, Second Department, citing Section 202, held that "the complaint fail[ed] to allege facts that would constitute a legally cognizable cause of action." *Id.* at 632. Third, in *Beck*, a case before me, the plaintiff sued Chase for breach of contract, breach of covenant of good faith and fair dealing, and negligence, alleging that Chase "ignored various red flags" and should have stopped her from wiring money to scammers. 2024 WL 3849361, at *3. I held that plaintiff's negligence claim was preempted because it was "predicated on Chase's acceptance of Beck's authorized payment order" and thus the imposition of additional security measures would be "inconsistent with the rights and liabilities expressly created by Article 4-A." *Id.* at *9. Here, too, Article 4-A preempts McCarthy's negligence claim because its "provisions protect against the type of underlying injury of misconduct alleged." *See Ma*, 597 F.3d at 89–90.

McCarthy's principal argument—that Article 4-A does not apply to the conduct at issue because Chase's alleged failure to warn McCarthy occurred *before*, not during, the wire

---

[16] Chase's contention on reply that McCarthy presents "the very same argument" as the plaintiff in *Jajati* is incorrect. (*See* Reply at 4–5.) The plaintiff in *Jajati* argued that banks have a duty to take back fraudulent transactions when they are put on notice of the fraud after the fact. *Jajati*, 711 F. Supp. 3d at 177 ("Plaintiff claims that Chase's tortious misconduct is that it released the funds to the beneficiaries after being put on notice of the alleged third-party fraud one month after the funds had been transferred."). McCarthy, by contrast, argues that, upon its bank officers hearing that he sought to wire money in amounts ranging from $40,500 to $98,900 to Thailand, but before they carried out the transfers, Chase should have known that McCarthy was likely the victim of a scam and, accordingly, Chase had a duty to warn him of the suspected scam. (Compl. ¶¶ 10–12.) While the facts of *Jajati* and this case are not identical, as Chase contends, these claims suffer from essentially the same flaw: a plaintiff cannot rely on the New York common law to create new exceptions to Article 4-A's general rule that banks are not required to refund wire transfers carried out upon authorization by their customers or wire transfers that are otherwise effective.

transfer—has no basis in the law. McCarthy cites *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* to argue that McCarthy's claim falls outside of Article 4-A because it is "not about the mechanics of how a funds transfer was conducted." (Opp'n at 15 (citing *Ma*, 597 F.3d at 84).) In *Ma*, however, the Second Circuit merely recognized in dicta that "[c]laims that . . . are not about the mechanics of how a funds transfer was conducted *may* fall outside of" Article 4-A because those claims are likely not inconsistent with Article 4-A's provisions. *Ma*, 597 F.3d at 89 (emphasis added). But McCarthy's claim is about the warning procedures Chase implemented, or failed to implement, after receiving a payment order. A bank's security procedures pertaining to the acceptance of a payment order is one of the "mechanics of wire transfers" to which the Second Circuit referred in *Ma. See id.*

McCarthy relies on *Pedersen* for the proposition that "claims . . . based on [a bank's] actions before and after the processing of the wire transfer . . . are not preempted," but this case is easily distinguishable. (Opp'n at 16 (quoting *Pedersen*, 527 F. Supp. 3d at 193).) There, the plaintiff executed a real estate contract and paid escrow funds to a trust account whose accountholder turned out to be committing fraud. *Id.* at 191. The plaintiff sued the bank operating the trust account, alleging that prior to and/or following its acceptance of the wire transfer, the bank, among other things: (1) "actively impeded plaintiffs' efforts to recover the stolen funds, including by hindering the FBI's investigation"; (2) "refused to take appropriate action upon learning that [plaintiff's trust account] was used to perpetrate fraud"; (3) "failed to appropriately monitor [plaintiff's trust account] for indicia of fraud"; (4) "failed to implement appropriate security measures for trust accounts and the bank"; and (5) "permitted [a third party] to use its trust account to complete its theft of plaintiffs' funds." *Id.* These allegations went far

20

outside the scope of the specific wire transfer at issue in that case.[17] In this case, by contrast, McCarthy's sole allegation is that, *after he ordered the wire transfer*, the Chase bank officers with whom he spoke failed to warn him of a potential scam before carrying out the wire transfer that he expressly ordered. (Compl. ¶ 9 ("By so advising the branch officer . . . that he was wiring money to Thailand . . . [McCarthy] put [Chase] on notice that [McCarthy was sending funds by wire to a wire destination inconsistent with [his] financial safety.").) Whether or not Chase has a procedure in place to warn accountholders of potential scams when they submit payment orders to Chase is clearly part of the "mechanics of wire transfers" and thus is exclusively covered by the provisions of Article 4-A, not New York common law.

For these reasons, McCarthy's common law negligence claim is preempted by Article 4-A.

### III. Failure to State a Claim for Negligence

#### A. Parties' Positions

Chase argues that, even if Article 4-A does not preempt McCarthy's negligence claim, I should nevertheless dismiss the Complaint because it does not plausibly plead a negligence claim under New York law. (Mot. at 13–16.) Specifically, Chase argues that, to be held liable for negligence, the defendant must owe the plaintiff a duty that arises independently of any underlying contract. (*Id.* at 14–15.) Banks, however, do not owe a duty to their customers outside of their contractual arrangements with those customers. (*Id.*) In support, Chase cites *Serengeti Express, LLC v. JPMorgan Chase Bank, N.A.*, No. 19-cv-5487, 2020 WL 2216661 (S.D.N.Y. May 7, 2020), where the court dismissed a plaintiff customer's gross negligence claim against

---

[17] In any event, *Pedersen*, a district court opinion from the Northern District New York, is not controlling law. To the extent the reasoning offered in that decision conflicts with my decision here, I respectfully disagree.

Chase because "[a]bsent the [plaintiff's] Deposit Account Agreement, Chase would owe no duty to [the plaintiff] and [the plaintiff] fail[ed] to establish any such independent duty." *Id.* Chase also cites numerous cases in which courts have dismissed similar negligence claims against banks on the grounds that the banks did not owe a duty to the plaintiffs in those cases. (*Id.* at 14–16.)

In opposition, McCarthy concedes that he "was unable to locate an American case imposing a duty on a financial institution to warn customers of potential fraud." (Opp'n at 11.) Instead, McCarthy cites decisions by courts in Canada and the United Kingdom, in which, McCarthy claims, the courts imposed duties on banks similar to the duty he seeks to impose here. (*Id.* at 11–15.)[18] McCarthy also cites decisions of courts in other states, where courts recognized a duty to warn in circumstances entirely unrelated to the facts of this case—for example, a therapist's duty to warn third parties when a patient poses an imminent danger to the third party. (*Id.* at 4–11.)

B. Analysis

To establish a prima facie case of negligence under New York law, the plaintiff must allege three elements: "(1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) plaintiff suffered damage as a proximate result of that breach."[19] *Serengeti*, 2020 WL 2216661, at *3 (citing *Curley v. AMR Corp.*, 153

---

[18] McCarthy cites the following foreign cases: *Zheng v. Bank of China (Canada) Vancouver Richmond Branch*, 2023 BCCA 43; *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, 2010 SCC 4; *Barclays Bank, PLC v. Quincecare Ltd.* [1992], 4 All ER 363; and *The Federal Republic of Nigeria v. JP Morgan Chase Bank, N.A.* [2019], EWCA Civ. 1641. (*See* Opp'n at 11–15.)

[19] No party addresses the second and third elements of a negligence claim under New York law. Nevertheless, with respect to the second element, I find that, even if Chase had a duty to warn McCarthy that it suspected he was the victim of a scam, the Complaint does not plausibly allege

F.3d 5, 13 (2d Cir. 1998)). In order to state a negligence claim, the alleged duty of care must

arise under *New York tort law*, independent of any duties created by *contract*. *See Fillmore East*

*BS Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 19 (2d Cir. 2014). New York courts have

long held that the relationship between an accountholder and his bank is contractual. *See*

*Serengeti*, 2020 WL 2216661, at *3–4; *see also Merrill Lynch*, 57 N.Y.2d at 444 ("[T]he

underlying relationship between a bank and its depositor is the contractual one of debtor and

creditor, implicit in which is the understanding that the bank will pay out its customer's funds

only in accordance with the latter's instructions.").

Under this standard, even if McCarthy's claim were not preempted by Article 4-A, it

must be dismissed for failure to state a claim. As McCarthy himself concedes, he has not found a

single case in any United States jurisdiction imposing on financial institutions the duty he asserts

here—a duty based in tort law to "warn customers of potential fraud"—merely based on the

customer requesting to wire an amount within the range of $40,000 to $99,000 to an entity in a

foreign country. (*See id.* at 11.) Indeed, "[t]ypically, under New York law, a bank does not have

an extracontractual duty to its depositors." *Abhyankar by Behrstock v. JPMorgan Chase, N.A.*,

No. 18-cv-9411, 2020 WL 4001661, at *5 (S.D.N.Y. July 15, 2020); *see also Serengeti*, 2020

WL 2216661, at *3–4.[20]

---

that Chase breached that duty. The Complaint's sole factual allegation on this point—that each
time McCarthy ordered a wire transfer, he told the Chase representative who carried out the
transfer that he "had been instructed to wire money to Thailand"—is not enough to plausibly
allege that Chase "knew or should have known that there was a substantial probability that
McCarthy was being scammed." (*See* Compl. ¶¶ 9–10.)

[20] The numerous cases cited in Chase's Motion further support the conclusion that Chase had no
extracontractual duty to warn McCarthy of potential fraud based on the allegation that on five
separate occasions McCarthy notified Chase staff that he sought to wire money from his Chase
accounts to Thailand. *See Socci v. JPMorgan Chase & Co.*, No. 17-cv-5469, 2018 WL 4388454,
at *3 (E.D.N.Y. Sept. 14, 2018) ("Plaintiff has not asserted any relationship with Defendant, or

Further, McCarthy cannot show that financial institutions are subject to such a duty to warn by relying on foreign court decisions imposing certain duties on financial institutions or on court decisions in other U.S. jurisdictions imposing duties on defendants in entirely unrelated circumstances. (*See* Opp'n at 4–16.) These cases are non-binding and irrelevant and, accordingly, do not alter the fact that New York common law does not recognize that financial institutions bear the "duty to warn" that McCarthy asks the Court to create in this case. *See, e.g.*, *Tarasoff v. Regents of the Univ. of Cal.*, 551 P.2d 334 (Cal. 1976) (California Supreme Court holding that, in certain circumstances, a therapist may have a duty to warn third parties about death threats made by clients); *Liebeck v. McDonald's Rest.*, No. 93-cv-2419, 1995 WL 360309 (1995 D.N.M.) (holding that McDonalds had a duty to warn customers about the danger of burns from its hot coffee).

Accordingly, the Complaint fails to state a claim for negligence under New York law.[21]

---

duty therefrom, beyond a standard banker-depositor contract. . . . Plaintiff may not assert a negligence claim against Defendant, and such claim is dismissed."); *Mraz v. JPMorgan Chase Bank*, No. 17-cv-6380, 2018 WL 2075427, at \*5 (E.D.N.Y. May 3, 2018) (dismissing negligence claim because Chase "did not owe Plaintiffs any duty independent of the contractual duties Chase owed Plaintiffs by virtue of" the deposit account agreement and could not assert "a contract claim repackaged as a tort claim"); *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 643 (E.D.N.Y. 2000) (dismissing negligence claims against Chase stemming from alleged fraudulent wire transfer of $152,000 because "[i]t is settled that a depositor may not sue his bank in negligence based solely on the contractual relationship between bank and depositor"); *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 471–72 (S.D.N.Y. 2016) (dismissing negligence claim against bank "for failure to state an independent legal duty" beyond the contract); *Blum*, 162 A.D.3d at 631–32 (2d Dep't 2018) (dismissing plaintiff's negligence claim against his bank because the plaintiff had authorized the wire transfer requests even though he "was allegedly induced to take that action by various fraudulent representations made by [a] third party").

[21] As noted above, I construe the Complaint to allege a negligence claim under New York tort law. *See supra* note 2. To the extent the Complaint alleges a claim under New York contract law, the Complaint also fails to state a claim because it does not cite a single provision of any contract between McCarthy and Chase, much less a provision indicating that the parties contracted to

## IV. Contractual Bar on McCarthy's Negligence Claim

### A. Parties' Positions

Finally, Chase argues that McCarthy's contractual arrangements with Chase—specifically, the Deposit Account Agreements and the Wire Transfer Agreements—bar McCarthy's negligence claim. In its Motion, Chase appears to combine two separate arguments. First, Chase argues that "under New York law, a bank does not have an extracontractual duty to its depositors." (Mot. at 11 (citing *Abhyankar by Behrstock*, 2020 WL 4001661, at *5).) This implies that any duty Chase owes to McCarthy must arise out of the parties' contracts (the Deposit Account Agreements and the Wire Transfer Agreements), and that Chase did not violate any terms of these contracts in carrying out the wire transfers. (Mot. at 13.) Second, Chase appears to argue that provisions in the Deposit Account Agreements and Wire Transfer Agreements operate as liability waivers that bar McCarthy's tort claim. (Mot. at 12; Deposit Account Agreements ¶ IX.B ("We will not be liable for anything we do when following your instructions."); Wire Transfer Agreements ¶ 2(a) ("You acknowledge these security procedures used for wire requests you make in a branch are a commercially reasonable method of verifying your branch wire transfer. You are responsible for any wire transfer issued in your name using these security procedures . . .").)

In opposition, McCarthy argues that, because the Deposit Account Agreements and the Wire Transfer Agreements do not expressly mention a "duty to warn," such a duty "may" exist independently of the controlling contracts. (Opp'n at 17.) McCarthy cites *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632 (E.D.N.Y. 2000), for the proposition that "negligence

---

impose a "duty to warn" on Chase. Having reviewed the agreements submitted by Chase in connection with the instant Motion, I find that no such provision exists. *See* Discussion Section IV.B.

actions that result from transfers outside of [the parties' contractual] relationship could be actionable under a theory that the bank owed a duty to its customers independent of the parties' contracts." (Opp'n at 17.) He also relies on *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454 (S.D.N.Y. 2016), for the proposition that "legal duties outside of the depositor agreement may exist that would support a negligence claim." (*Id.*)

On reply, Chase reiterates its argument that the Deposit Account Agreements and the Wire Transfer Agreements bar McCarthy's negligence claims here. (Reply at 6–7.) Chase also relies on *Jajati*, where the court held that Chase's wire transfer agreements executed by the plaintiff barred the plaintiff's negligence claim against Chase following the plaintiff's transfer of funds to scammers. (*Id.* (citing *Jajati*, 711 F. Supp. 3d at 174).)

B. <u>Analysis</u>

As discussed above at Discussion Section III.A, under New York law, banks do not have an extracontractual duty to warn their depositors of suspected fraud with respect to their depositors' wire transfers; consequently, any alleged breach of a duty by Chase must arise out of the parties' contractual agreements. *See Abhyankar by Behrstock*, 2020 WL 4001661, at *5 (collecting cases).

Here, the Complaint does not allege that Chase failed to comply with any of the provisions set forth in the Deposit Account Agreements or the Wire Transfer Agreements. In fact, the Complaint's allegations that McCarthy himself instructed Chase bank officers to wire funds to Thailand and that Chase bank officers complied with McCarthy's instructions supports the notion that Chase complied with its contractual duties. (Compl. ¶¶ 6, 8; Deposit Account Agreements ¶ III.E.2 ("We may subtract from your available balance the amount of any check or other item that we receive throughout the day that you or any person you authorize created or

26

approved."); Wire Transfer Agreements ¶ 3(a) ("We'll start processing your wire transfer the same business day if we receive it before the cutoff times we establish . . .").) Likewise, in opposition, McCarthy repeatedly notes that he does not challenge the wire transfer process itself. (Opp'n at 1 ("Plaintiff here does not challenge the wiring process that occurred after Mr. McCarthy's transfer request."); *id.* at 2 ("Mr. McCarthy does not challenge the wire process.").)

None of the agreements between McCarthy and Chase indicate that Chase has a "duty to warn" its depositors in the event it suspects a possible scam. McCarthy's argument that, in some cases, a financial institution *may* have an extracontractual duty, is unconvincing, since he cites no authority demonstrating that any extracontractual duty exists *in this case. See* Discussion Section III. In fact, in *Tevdorachvili*, on which McCarthy relies, the court dismissed the plaintiff's negligence claim against Chase arising out of allegedly fraudulent wire transfers as "patently groundless," in part because the plaintiff had not alleged any legally cognizable extracontractual duty that Chase had violated in carrying out the wire transfers. 103 F. Supp. 2d at 643–44.

Since Chase has no cognizable duty here independent of its contractual obligations and the Complaint does not allege any breach of those contractual obligations, I find that the Deposit Account Agreements and the Wire Transfer Agreements do not give rise to a "duty to warn" claim. Because I find that Chase does not have any cognizable extracontractual duties toward McCarthy in this case, I do not consider whether provisions in the Deposit Account Agreements and the Wire Transfer Agreements operate as liability waivers with respect to those non-existent duties.

**CONCLUSION**

For the reasons set forth above, Chase's Motion to Dismiss the Complaint is granted.

(ECF No. 23.) The Court dismisses the Complaint in its entirety with prejudice.


Dated:  Central Islip, New York
        March 25, 2025

                                        _____*/s/ Nusrat J. Choudhury*_____
                                        NUSRAT J. CHOUDHURY
                                        United States District Judge